**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHERAY NORRIS, | ) | CASE NO. 1:19CV0040 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Sheray Norris ("Plaintiff" or "Norris"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C.

§§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g)

and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In January 18, 2013, Norris filed an application for SSI alleging a disability onset date of

November 29, 2012 and claiming she was disabled due to unspecified arthropathies and

affective/mood disorders. (Transcript ("Tr.") at 227.) The application was denied initially and upon

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

reconsideration, and Norris requested a hearing before an administrative law judge ("ALJ"). (*Id*. at 297, 307.)

On April 1, 2015, an ALJ held a hearing, during which Norris, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*. at 171-95.) On June 16, 2015, the ALJ issued a written decision finding Norris was not disabled. (*Id.* at 241-60.) Norris requested review, and on June 9, 2016, the Appeals Council remanded her claim for a new hearing, to address her need for a wheeled walker and evaluate the opinions of the treating physicians regarding her physical and mental limitations. (*Id*. at 263-65.)

On February 14, 2017, the ALJ held a second hearing, during which Norris, represented by counsel, and a VE testified. (*Id*. at 143-70.) A medical expert had also been called to testify, but was unable to attend. (*Id.* at 145.) On March 14, 2017, the ALJ issued a written decision finding Norris was not disabled. (*Id.* at 267-86.) Norris again requested review of the ALJ's decision, and the Appeals Council again remanded her claim for a new hearing to address her need for ambulatory aid, the opinions from her medical sources, and her symptoms. (*Id.* at 42-44, 287-91.)

On May 1, 2018, a new ALJ held a third hearing, during which Norris, represented by counsel, and a VE testified. (*Id*. at 92-136.) On July 25, 2018, the ALJ issued a written decision finding that Norris was disabled for the period beginning May 9, 2017. (*Id.*) This partially-favorable decision was based on the fact that Norris' age category changed when she turned 50. (*Id.*) The ALJ's decision became final on December 11, 2018, when the Appeals Council declined further review. (*Id*. at 1-5.)

On January 8, 2019, Norris filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 16.) Norris asserts the following assignments of error:

(1)     Whether the ALJ committed reversible error when she failed to recognize Ms. Norris' intellectual deficits and illiteracy as a severe impairment.

(2)     Whether the ALJ properly evaluated and weighed the opinion of Ms. Norris' treating psychiatrist.

(3)     Whether the ALJ committed reversible error in her assessment of Ms. Norris' need for a cane when standing and its' impact on her residual functional capacity.

(Doc. No. 12.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Norris was born in May 1967, and was 45 years old at the time of her application, and 50 years old at the time of the ALJ's finding of disability. (Tr. at 80, 196, 473.) Prior to the established disability onset date, Norris was a younger individual age 45-49. (*Id*.) On May 9, 2017, her age category changed to an individual closely approaching advanced age under social security regulations. (*Id*.) *See* 20 C.F.R. §§ 404.1563 & 416.963. She attended school through the twelfth grade, but did not earn a high school diploma, and is able to communicate in English. (*Id.* at 80, 174, 153.) She has no past relevant work. (*Id*.)

**B.  Relevant Medical Evidence[2]**

**1.  Mental Impairments**

On June 13, 2012, Norris began care with a new counselor, Dr. Clark Herniman, at the Free Clinic of Greater Cleveland ("Free Clinic"), where she had being treated for a substance-induced mood disorder versus a mood disorder with psychotic features since 2009.  (*Id.* at 839.)  Her substance abuse was noted to be in remission, and she regularly attended AA meetings and participated in the intensive outpatient program at the Free Clinic.  (*Id.*)  She reported hearing voices, seeing things, being paranoid, experiencing mood swings when she was high, and feeling depressed and bored when sober.  (*Id.*)

On August 23, 2012, Norris completed the intensive outpatient program at the Free Clinic.  (*Id.* at 713.)

On September 12, 2012, Vocational Guidance Services provided a situational assessment of Norris' ability to work in food service, based on a three-week evaluation.  (*Id.* at 1944-53.)  The assessors noted that:

> Sheray learns new tasks with ease, yet need some improvement in the areas of retaining instructions and following verbal and written instructions. . . . Sheray requires much improvement in the area of accepting supervision. . . . Sheray's attendance was unacceptable.  Sheray left early 1 day her first week because she did not want to do the class assignment.

(*Id.* at 1946.)  The assessor could not recommend competitive employment due to Norris' attendance and behavioral issues.  (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On October 26, 2012, Norris was referred for psychiatry services. (*Id.* at 713.) She had been taking Celexa, Vistaril, Hydrodiuril and Seroquel, but reported being out of all her medications except Seroquel. (*Id.*) She reported sleep disturbances, lack of energy, trouble concentrating, and feelings of guilt, irritability, and restlessness. (*Id.*) The referring therapist noted that since Norris reported being out of her medications, she had been "noticeable more irritable." (*Id.*)

On November 14, 2012, Norris had her initial psychiatric evaluation with Dr. Park. (*Id.* at 709.) She reported delusions and hallucinations, as well as anxiety, restlessness and irritability. (*Id.*) The assessing psychiatrist noted that in 2009 Norris had experienced auditory hallucinations telling her to kill her husband, but opined that she was not currently a danger to herself or others. (*Id.*) He diagnosed a possible mood disorder with psychotic features. (*Id.* at 711.)

On February 20, 2013, a psychiatric progress note recorded a primary diagnosis of schizoaffective disorder, and increased Norris' dosage of Seroquel. (*Id.*)

On May 1, 2013, Dr. Park competed a medical source statement regarding Norris' mental capacity. (*Id.* at 816-17.) He opined that she could:

- rarely deal with work stress and manage funds;

- occasionally follow work rules, interact with supervisors, function independently, work in proximity to others without being distracted or distracting, complete a normal work day or work week without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length or rest periods, behave in an emotionally stable manner, and relate predictably in social situations; and

- frequently use judgment, maintain attention for two hour segments, respond appropriately to changes in routine, maintain regular attendance and be punctual, deal with the public, relate to co-workers, understand, remember, and carry out complex or detailed job instructions, and socialize.

(*Id.*)

On July 10, 2013, Norris returned to the Free Clinic and reported feelings of paranoia and irritability. (*Id.* at 1588.) The treating psychiatrist increased her doses of Seroquel and Celexa, and referred her to therapy for anger management. (*Id.* at 1589.)

On January 17, 2014, Norris returned to the Free Clinic and reported feelings of irritability, and trouble concentrating and focusing. (*Id.* at 1624.) She also reported auditory and visual hallucinations. (*Id.*) The treating psychiatrist, Dr. Elizabeth Baker, planned to transition Norris from Seroquel to Latuda, due to Seroquel's metabolic effects. (*Id.* at 1625.)

On February 14, 2014, Norris returned to the Free Clinic and reported that she was "doing well," although she "still gets irritated easily." (*Id.* at 1626.) Her mood, appetite and sleep were good, but she continued to experience hallucinations. (*Id.*)

On March 8, 2014, her psychotherapist noted that Norris reported modifying her medications "because she does not like taking the full dose because it makes her feel 'funny,'" and had resumed drinking alcohol in small amounts. (*Id.* at 1628.) She noted that the homework she assigned was completed but that Norris was unable to write legibly or clearly. (*Id.*) She opined that Norris did not suffer "real" hallucinations that were the product of mental illness, but rather had a "very vivid and active imagination. (*Id.*) Her diagnosis had shifted to Depressed Bipolar 1 Disorder with rapid cycling. (*Id.* at 1629.)

On March 28, 2014, Norris saw Dr. Baker, who still described her primary diagnosis as schizoaffective disorder. (*Id.* at 1739.) Norris reported "acting up" by cutting up her husband's bedspread, jacket and shirt. (*Id.*) She reported that her mood and appetite were good, but she became "[f]rustrated when I don't get my way. When I get my way, I am calm, cool and collected." (*Id.*)

On April 25, 2014, Norris reported to Dr. Baker that her mood was more stable on Latuda, however she was not sleeping as well as she had while on Seroquel, and felt chronically tired as a result. (*Id.* at 1741.)

On June 13, 2014, Dr. Baker noted that "generally [Norris] is doing well from a mental health perspective," and she was now sleeping well. (*Id.* at 1743.) Norris had been waiting for 3 months for an appointment with the Center for Families and Children, and Dr. Baker called with her at this appointment and was able to get her registered in intake, because she needed a "higher level of services."[3] (*Id.* at 1743-44.)

On August 7, 2015, MetroHealth Nurse Practitioner Karen Collins completed a medical source statement for Norris. (*Id.* at 1918-19.) She opined that Norris could:

- rarely respond appropriately to changes in routine, deal with the public, interact with supervisors, work in proximity to others without being distracted, deal with work stress, socialize and relate predictably in social situations;

- occasionally use judgment, maintain attention for two hour segments, maintain regular attendance and be punctual, relate to co-workers, function independently, complete a normal work day or work week without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length or rest periods, understand, remember and carry out complex or detailed job instructions, behave in an emotionally stable manner, and manage funds or schedules;

- frequently work in proximity to others without being distracting, understand, remember and carry out simple job instructions, maintain her appearance, and leave home on her own; and

- constantly follow work rules.

(*Id.*)

---

[3] Neither party cites evidence showing that Norris attended this appointment or received services at the Center for Families and Children.

On November 17 and December 15, 2015, Norris reported auditory and visual hallucinations, and uncertainty over whether she was taking her medication correctly. (*Id.* at 1997, 2011.)

In February 2016, Norris participated in a 10-day work adjustment program through Goodwill. (*Id.* at 1922.) She only attended 5 of 9 days of programming in full, but arrived on time every day that she was present. (*Id.* at 1929.) Her assessor noted that she interacted appropriately with all customers, co-workers, and supervisors 100% of the time; displayed a pleasant demeanor; was observed interacting at length with customers on two occasions, but returned to her tasks without prompting; took her breaks and returned as scheduled; and completed tasks in full and as they were assigned, although she was sometimes confused and required repeated instructions. (*Id.*) Her assessor judged her not ready for competitive work due to "attendance, quality of work, and retention of tasks." (*Id.*)

On April 21, 2016, MetroHealth Nurse Practitioner Karen Collins completed an updated medical source statement for Norris. (*Id.* at 1933-34.) She opined that Norris could:

- rarely deal with work stress, and complete a normal work day or work week without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length or rest periods;

- occasionally maintain regular attendance and be punctual, deal with the public, function independently, interact with supervisors, work in proximity to others without being distracted or distracting, understand, remember and carry out complex or detailed job instructions, socialize, behave in an emotionally stable manner, and relate predictably in social situations; and

- frequently follow work rules, use judgment, maintain attention for 2 hour segments, respond appropriately to changes in routine, relate to co-workers, understand, function independently, understand, remember and carry out simple job instructions, and maintain her appearance; and

- constantly manage funds and schedules, and maintain her appearance.

8

(*Id.*)

On July 12, 2016, Norris told her therapist she was having paranoid thoughts about aliens. (*Id.* at 2103.)  Her therapist noted delusional thinking.  (*Id.* at 2104.)

On October 5, 2016, Norris told her therapist "everything was going alright" and she was keeping to herself "like I always do."  (*Id.* at 2175.)  She still had delusional thoughts regarding aliens, but reported that these only occurred when she didn't take her medicine.  (*Id.* at 2175-76.)

On January 4, 2017, Norris reported to her therapist that she was "still seeing things, but knows they are not there."  (*Id.* at 2206.)

On May 30, 2017, Dr. Richard Litwin performed a psychological evaluation of Norris.  (*Id.* at 2213-16.)  He administered nationally-normed intelligence tests and assessed her verbal IQ at 61, performance IQ at 69, and full scale IQ at 66, which are all in the mild intellectual disability range. (*Id.* at 2214.)  She was unable to complete assessments of executive functioning due to "poor learning and perseveration on the wrong strategies."  (*Id.*)  He also administered aptitude tests, and assessed her word reading at the second grade level, and spelling and math at the third grade level. (*Id.*)  He noted that her aptitude levels were "below basic literacy," and she would not be able to complete job applications, read work forms for comprehension, or work on tasks involving strong numerical reasoning skills.  (*Id.* at 2216.)  He described Norris as "emotionally brittle," and noted she was 'extremely nervous" and "copes by avoiding others."  (*Id.* at 2216.)  He reported that she had used crack cocaine as recently as 3 months prior, and worried that the stress of returning to work might cause her to relapse.  (*Id.* at 2213, 2216.)  He recommended that she participate in volunteer work for a period of several months before considering competitive employment.  (*Id.* at 2215.)

On March 29, 2018, Norris reported to Nurse Collins that she was "doing fine" and conflict with her husband was reduced since they now had separate apartments, although her husband stayed with her every night. (*Id.* at 2622.) She had not taken her medications since April 2017, and her moods were "going up and down." (*Id.*) Nurse Collins restarted her Latuda and Celexa prescriptions. (*Id.* at 2264.)

## 2. Physical Impairments

Norris received medical care at the Free Clinic from at least April 2012. (Tr. 716.) On April 24, 2012, clinical notes indicated Norris had a diagnosis of chest wall pain, back pain, cervical neck strain, radiculopathy along her right arm, and obesity. (*Id.*)

On June 7, 2012, Norris told her care provider she had begun participating in a vocational program, but her legs were "giving out," and her feet were swelling. (*Id.* at 719.)

On June 12, 2012, she reported to her care provider that she had experienced leg pain when she stood since 2009, her knees gave out, she "constantly" needed to change positions but sometimes got numbness in her arms and legs when she did, and got tired going up and down stairs. (*Id.* at 720.)

On January 13, 2014, Norris reported chest wall pain that co-occurred with paresthesis in her right arm, pain in her left arm when she reached over her head, dizziness when she changed positions, fatigue, and trouble sleeping. (*Id*. at 732.)

On March 20, 2013, Norris was seen at MetroHealth's Heart and Vascular Center. (*Id*. at 885.) She reported having a few years' history of sharp, shooting chest pain, extending from her right upper chest to under her right breast, lasting "constantly for an hour, sometimes and hour and a half." (*Id.* at 885-86) This pain was sometimes so severe that it caused her to bend over and grab

her chest, and was sometimes accompanied by nausea. (*Id*. at 885.) The Nurse Practitioner's impression was atypical chest pain, and synocope suggesting a vasovagal response, perhaps related to her antidepressant medications. (*Id*. at 888.)

On April 11, 2013, a sleep study was performed at MetroHealth because Norris reported excessive daytime sleepiness, not feeling refreshed after sleep, gagging or choking at night, and waking up with a headache. (*Id*. at 1003.) It demonstrated Severe Obstructive Sleep Apnea Syndrome. (*Id*. at 1005.) As a result, Norris was proscribed a CPAP. (*Id*. at 898.)

On April 11, 2013, a polysomnogram performed at MetroHealth again demonstrated Severe Obstructive Sleep Apnea Syndrome. (*Id.* at 1067.) Again, treatment with a CPAP was discussed. (*Id*. at 1070.)

On May 7, 2013, Norris was seen by Dr. Raju at MetroHealth for a disability evaluation. (*Id.* at 1048.) She reported lower back pain, that had troubled her "on and off" since 1998, but gotten worse since 2009. (*Id.* at 1045.) Her back exam revealed a decreased lumbar lordotic curve, mildly decreased range of motion in all planes, with increased pain on her flexion, tenderness at the left lumbarsacral junction, left gluteus, and sacroiliac joint on the left, and low normal bilateral patellar and achilles reflexes. (*Id.* at 1047-48.) The examining physician recommended physical therapy, and noted that Norris needed to engage in treatment options before he could evaluate her disability. (*Id*. at 1048.)

On May 14, 2013, Norris began physical therapy to address chronic pain, increase the range of motion in her lumbar spine, and increase her strength and ability to function. (*Id.* at 1059.) The 12-week goal for her physical therapy was that she would be able to stand, sit, or walk for 30 minutes without significant difficulty. (*Id.*)

On July 2, 2013, Norris returned to Dr. Raju for a follow-up to her May disability evaluation. (*Id.* at 1575.) She described herself as "50% better" following three sessions of physical therapy, regular home exercise, flexeril and use of a TENS unit to treat her pain. (*Id.*) The examining doctor noted that Norris "didn't say anything about disability today and looks forward to getting 10% pain relief." (*Id.*)

On August 26, 2013, Norris was seen at MetroHealth for a follow-up sleep medicine visit. (*Id.* at 1592.) She reported "I'm using my cpap and I love it." (*Id.*)

On October 22, 2013, Norris returned to Dr. Raju for a second follow-up visit. (*Id.* at 1599.) She reported that her lower back pain was "waxing and waning" and her knee pain was getting worse with winter, but she continued her home exercise program daily and was enthusiastic about the pain relief from her TENS unit. (*Id.*) Dr. Raju performed a disability evaluation at Norris' request. (*Id.*) He opined that Norris could lift 30 pounds occasionally and 20 frequently; stand a total of 8 hours, but stand only 2-3 without interruption; had no sitting impairment; could climb occasionally and balance frequently; could rarely stoop, crouch or crawl; had no restrictions in reaching, pushing, pulling or gross manipulation; and no environmental restrictions. (*Id.* at 1602.)

On January 21, 2014, Norris saw Dr. Raju complaining that her right toe had been hurting ever since she banged it into a table four months previously. (*Id.* at 1637.) Her lower back pain continued to wax and wane, and she had no plans to go back to work, but was "doing overall well" and continued to do home exercises every other day. (*Id.*)

On February 17, 2014, Norris was seen at the MetroHealth medical clinic for a follow up for her hypertension. (*Id.* at 1646.) She reported that she did not like taking her blood pressure medication, and therefore was not doing so. (*Id.*) She also reported intermittent right arm tingling

and numbness, that "lasts for a few minutes [then] goes away [and] does not affect her ability to grasp or pick up objects." (*Id.*)

On April 1, 2014, Norris saw Dr. Raju, and reported her toe pain was 50% improved and her back was "not bothersome." (*Id.* at 1655.) He noted that while she had "minimal restrictions from a musculoskeletal standpoint," the pain relief she had achieved had not led to any functional gains. (*Id.* at 1658.)

On August 1, 2014, Norris went to MetroHealth's Acute Care Clinic for shortness of breath and chest pain. (*Id.* at 1666.) The examining physician assessed her symptoms as "likely secondary to chronic nicotine abuse and obesity." (*Id.* at 1668.) A stress echocardiogram and EKG were "unrevealing." (*Id.* at 1669.)

On September 4, 2014, Norris began treatment with Dr. Akinsiku at MetroHealth. (*Id.* at 1675.) She was experiencing acute tooth pain, with an extraction planned for the following day and had begun trying to quit smoking three days prior to the appointment. (*Id.* at 1676.) She expressed homicidal thoughts towards her husband. (*Id.* at 1678.) Dr. Akinsiku noted her history of domestic violence, and had a Metro police officer escort her to the psychiatric emergency room for evaluation. (*Id.*)

On February 18, 2015, Norris went to the MetroHealth Emergency Department for low back pain that had been intermittent for six weeks. (*Id.* at 1764.) She reported her pain was exacerbated by standing or changing positions in bed. (*Id.*) The treating physician's assistant diagnosed sciatica and discharged her with tramadol and prednisone for her pain. (*Id.* at 1768.)

On February 18, 2015, Norris returned to Dr. Akinsikyu for a follow-up visit. (*Id.* at 1772.) She reported her back pain and spasms had grown worse over the past one and a half months. (*Id.*)

13

She had run out of flexeril, which had previously been effective in controlling her pain. (*Id.*) The physical examination showed pain with palpation of her right lower paraspinal muscles and buttock, as well as decreased sensation to light touch and microfilament on her right upper thigh, and slightly diminished motor strength in her right lower extremity. (*Id.* at 1776.)

On March 12, 2015, Norris began a new course of physical therapy to treat her low back, buttock, and right leg pain. (*Id.* at 1818.) The therapist noted her "slow antalgic unsteady gate" and although a cane was tried, Norris was still unsteady, so the therapist concluded she would be safer with a rolling walker, which was ordered for Norris. (*Id.* at 1826.) Norris reported she had a TENS unit at home, but "it did not help." (*Id.*)

On March 27 and 31, 2015, Norris used the rolling walker to attend additional physical therapy sessions. (*Id.* at 1894, 1912.) The therapists noted she reported difficulty with donning and doffing shoes, bending, and dressing, and her gait remained antalgic and slow with the rolling walker. (*Id.* at 1898, 1912.) She reported that her TENS unit was now "helping somewhat." (*Id.*)

On September 15, 2015, Dr. Mahmood Gharib examined Norris and completed a medical source statement regarding her physical capacity. (*Id.* at 1920-21.) He opined that she could:

- lift 10-15 pounds both frequently and occasionally;

- could stand or walk for only 10-15 minutes at a time and for 4-5 hours overall, with the use of a quad cane;

- could sit for 30-45 minutes at a time and for 5-6 hours total;

- needed to be able to alternate positions at will;

- could rarely climb, crouch kneel, or crawl;

- could occasionally balance, stoop, reach, push or pull, and do fine or gross manipulation;

- needed additional unscheduled breaks to sit for at least 3-4 hours on an average day;

- needed to elevate her legs 90 degrees at will;

- experienced moderate pain that would interfere with her concentration, take her off task, and cause absenteeism.

In February 2016, Norris participated in a 10-day work adjustment program through Goodwill. (*Id.* at 1922.) She only attended 5 of 9 days of programming in full, but arrived on time every day that she was present. (*Id.* at 1929.) She did not attend two days because of pain. (*Id.*) She mentioned pain in her legs daily, and told her assessor that she owned a cane and a walker, but did not bring them with her to Goodwill because she felt she could not "do her job" while using them. (*Id.*) Her assessor recommended that she receive clearance from her physician before attending any further work adjustment programs, and Norris expressed that she did not believe she was ready to begin the process for competitive employment, and would not participate in further programming. (*Id.*)

On March 15, 2016, Dr. Gharib saw Norris for a follow up visit. (*Id.* at 2029.) He noted that he had last seen her in December and "[s]ince last visit she is doing great!" (*Id.*) He also noted that she had obtained a left counter-force brace, her low back pain remained stable and unchanged, and she still required the use of her quad cane for walking. (*Id.*) She reported that her overall pain had improved with her recent increase in activity, including walking her dog and using a stationary bike, however she was becoming fatigued more quickly. (*Id.*)

On July 5, 2016, Dr. Richard Wilson at MetroHealth, who had previously treated Norris, performed a physical examination and completed a medical source statement regarding her physical capacity. (*Id.* at 2092.) He opined that she:

15

- could lift 10 pounds both frequently and 20 pounds occasionally;

- could carry 5 pounds frequently and 10 occasionally, however her need to use a cane or walker affected her ability to carry;

- could stand or walk for 33 minutes without interruption and for 4 hours overall;

- could sit for 25-30 minutes at a time and for 4 hours total;

- needed to alternate positions at will;

- could rarely climb, balance, stoop, crouch, kneel, or crawl due to her back pin and need to use a walker or cane;

- could rarely reach, push, and pull due to her need for a walker or cane;

- could occasionally do fine and gross manipulation due to pain in her left wrist and elbow;

- had been prescribed a cane, walker and brace;

- was at risk for falls;

- experienced severe pain that interfered with her concentration, took her off-task, and would cause absenteeism;

- would require additional unscheduled rest periods every 30 minutes during an 8 hour workday.

(*Id.* at 1940-41.)

On October 4, 2016, Norris was returned to MetroHealth for treatment of her hand and left elbow pain. (*Id.* at 2147.) She was using a compression stocking on her left elbow and a brace on her left wrist, which provided pain relief, however within the past 2-3 months, she had developed knee pain that worsened with activity, and subsided with rest. (*Id.*) She reported she continued to rely on her quad cane for walking, and used her walker for longer distances. (*Id.*)

On January 1, 2017, Norris returned to MetroHealth for a follow-up visit. (*Id.* at 2188.) She reported some improvement in pain, although she continued to use a compression stocking on her left elbow and a brace on her left wrist, which provided pain relief. (*Id.*) She continued to walk with a quad cane and wanted to transfer to using her walker, which the doctor discouraged. (*Id.*) She had fallen from a seated position on the toilet four days earlier. (*Id.*)

## C. State Agency Reports

### 1. Mental Impairments

On February 25, 2013, Dr. David House performed a consultative psychological examination of Norris. (*Id.* at 748-54.) He found her speech to be "understandable," and not marked 'at least significantly" by poverty of content, however he noted her speech patterns were "odd" and there was an "emotional quality beneath her speech. (*Id.* at 750.) He noted her computational skills were limited to single-digit addition, and stated that while "there is not information to advance a diagnosis related to intellectual functioning" he "believed she would have difficulty with testing." (*Id.* at 753.) He opined that Norris could "follow fairly simple instructions," had serious limitations in concentration and attention that would limit her to following "simple and short" instructions, was likely to isolate herself, and would have "serious difficulties responding to stressful situations." (*Id.*) He judged her prognosis as "poor." (*Id.* at 754.)

On March 7, 2013, Dr. Caroline Lewin, a state reviewing psychologist, considered the record and opined that Norris had limitations in sustained concentration and persistence, the ability to carry out detailed instructions, the ability to work with others without being distracted, the ability to complete a normal work day and work week without interruption from psychologically-based symptoms, the ability to respond appropriately to changes at work. (*Id.* at 206-07.) She believed

Norris could "adapt to a setting in which duties are routine and predictable and in which she is not expected to adhere to strict production standards." (*Id.* at 207.)

On May 13, 2013, Dr. Patricia Semmelman, a state reviewing psychologist, also reviewed the record and concurred with Dr. Lewin's assessment of Norris' limitations. (*Id.* at 223-24.)

### 2. Physical Impairments

On March 7, 2013, Dr. Gerald Klyop, a state reviewing physician, considered the record and opined that Norris could lift and carry up to 50 pounds occasionally and 25 pounds frequently; stand, walk or sit for 6 hours in an 8-hour work day; frequently climb ladders, ropes and scaffolds but require no other postural limitations; require no manipulative limitations other than limited reaching over her head on her right side; and needed to avoid concentrated exposure to noise and hazards such as machinery and heights. (*Id.* at 204-06.)

On May 7, 2013, Dr. Diana Manos, a state reviewing physician, considered the record and concurred with Dr. Klyop's findings. (*Id.* at 220-22.)

### D. Hearing Testimony[4]

During the April 1, 2015 hearing, Norris testified to the following:

- She attended the hearing using a walker that had been given to her two weeks prior to the hearing, to help her balance. (*Id.* at 175.)

- She believes her disability began on November 29, 2012 because "that's when it started with my back. . . . and my butt." (*Id.* at 176.)

- She reported sciatica, sleep apnea, swollen ankles and feet, chest pain and shortness of breath. (*Id.* at 177, 179.)

---

[4] Because there is extensive testimony in the three hearings held in this case, the Court is reciting only that testimony which the parties cite, or which is relied on in this Memorandum.

- She had used cocaine and marijuana but stopped six months before the hearing. (*Id.* at 178.)

- Her mother or her husband help her to grocery shop at the beginning of every month. She walks around the grocery store with her cane, and sits when she starts to feel pain. (*Id.* at 183-84.)

During the February 14, 2017 hearing, Norris testified to the following:

- She attended the hearing using a quad cane, and explained her doctor did not want her to rely on the rolling walker because it made her bones weak. (*Id.* at 146.)

- She had last used drugs and alcohol four and a half months prior to the hearing. (*Id.* at 148.)

- She experienced eczema, chest pains, muscle spasms in her lower back into her buttocks, pain in her right toe, pain in her knee, and pain in her left elbow and wrist. (*Id.* at 152-53, 158.)

- She cannot sit or stand for more than 20 minutes, or walk for more than 5 minutes without experiencing back pain. (*Id.* at 154.)

- She had limited use of her left arm due to pain. (*Id.* at 156.)

- She is diagnosed as a "bipolar schizophrenic" and has anxiety attacks when she is around "drama" or crowds. (*Id.* at 156-57.)

- She doesn't take public transportation because she cannot handle being around the other people, and cannot stand that long. (*Id.* at 158.)

- The only times she leaves her house is when she goes to the grocery store on the first of the month. (*Id.* at 159.)

During the May 1, 2018 hearing, Norris testified to the following:

- She has never had a driver's license, and was driven to the hearing by her husband. (*Id.* at 96.)

- She no longer lives with her husband because she was unable to manage the 20 stairs to get in and out, and his apartment is "messed up, and they're fixing it up now." (*Id.* at 117-18.)

19

- Her new apartment is on the ground level, which is helpful because she has trouble using stairs. (*Id.* at 115.)

- At home, she sits down to wash dishes and prepare meals. (*Id.* at 98.)

- She can do her own laundry because it is on the same floor as her apartment, but her husband takes out her trash when he visits, and does most of her housework. (*Id.* at 99.)

- Her husband or mother help her grocery shop, because she needs to use her cane and therefore can't push the cart. (*Id.*)

- She does not like to read because she has trouble seeing the words. She uses a magnifying glass, but "I put that down because I don't like to read." (*Id.* at 100.)

- She has a chihuahua, but does not walk her because she is trained to use "the dog potty." (*Id.* at 103.)

- She naps once or twice a day, from 30 minutes to 3 hours. (*Id.* at 103.)

- Her husband runs her errands for her. (*Id.* at 104-05.)

- She has panic attacks that are brought on by groups of people, hearing arguments, sudden loud noises, or sadness. They cause her to start shaking and have difficulty breathing. (*Id.* at 106-07.)

- Her left arm, wrist, and hand shake and hurt with a burning pain. She wears a brace on that arm every day. (*Id.* at 109.)

- She uses her cane for both standing and walking, but the rolling walker is more helpful with her sciatica pain. (*Id.* at 110, 115.)

- She thinks she can lift and carry 20 pounds, and stand for a half-an-hour to an hour before she needs to sit down. (*Id.* at 114.)

- She can only lift a gallon of milk with her right hand. (*Id.* at 119.)

- She can get down on both knees, but can't get back up. (*Id.*)

At the May 1, 2018, hearing, the VE testified Norris had no significant vocational history.

(*Id.* at 127-28.) The ALJ then posed the following hypothetical question:

Assume a hypothetical person of the same age, education and employment background as Ms. Norris. This person can lift and carry 50 pounds occasionally, 25 pounds frequently, stand and walk for six hours, sit for six. We will say that this person can climb stairs and ramps, but only occasionally ladders, ropes and scaffolding. This person is able to reach in front . . . . [and] can occasionally reach overhead. Ths person is able to we'll say handle, finger, and feel. And would avoid loud machinery. This person is performing simple routine tasks, with simple short instructions, making simple decisions, and having few workplace changes, with no fast-paced production quota requirements. Would you be able to identify any work in the regional or national economy for such a person?

(*Id*. at 128.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as store labor, washer, and hand packager. (*Id*. at 128-29.)

The ALJ next amended the hypothetical and posed the following hypothetical:

The next person can lift and carry 20 pounds occasionally, 10 pounds frequently. This person can stand and walk for six hours, sit for six, but could use a sit, stand option every hour. That lasts about five minutes, but they don't have to leave the workstation. This person can occasionally climb stairs and ramps. No ladders, ropes and scaffolding. This person can occasionally balance, stoop, kneel, crouch, and crawl. This person . . . can reach in front. This person can occasionally reach overhead. Ths person is frequently handling, fingering, and feeling. The mental limitations remain the same, with the addition of the person should have only occasional and superficial interaction with co-workers, supervisors, and the public. Superficial refers to the ability to ask and answer simple question, give and follow simple directions. This person won't be responsible for the safety of others, but would be able to direct someone to the nearest exit, or to the restroom. They are not having to confront or negotiate with their co-workers. Would you be able to identify any work in the regional or national economy for that hypothetical person?

(*Id*. at 129.)

The ALJ amended the second hypothetical to include the elimination of loud machinery. (*Id*. at 129.) The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as mail clerk, markers, or copy machine operator. (*Id*.)

The ALJ then posed the a third hypothetical question:

> The next person can lift and carry 10 pounds occasionally, 5 pounds frequently. This person can stand and walk for four hours in an eight-hour day, and sit for four hours in an eight-hour day. This person is going to use a cane when ambulating. . . .We will keep all the other limitations the same from hypothetical number two. . . Would there be any work in the regional or national economy for that hypothetical person?

(*Id*. at 130-31.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as bench assembler, charge account clerk, and table worker. (*Id*. at 131.) However, if the hypothetical individual was off-task 10% of the work day, she could not identify competitive employment. (*Id*. at 132.)

Next, Norris' attorney questioned the VE, who testified that if the second and third hypothticals were amended to change the limitations for reaching in front and overhead, as well as handle and finger, to occasional; and to require use of a cane at all times while ambulating and standing, due to a need for assistance with walking and balancing, then she could not identify competitive employment for either hypothetical individual. (*Id*. at 133.)

## III.   STANDARD FOR DISABILITY

Under the Act, a claimant is disabled if they prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since the alleged onset date.

2.     Since the alleged onset date of disability, November 29, 2012, the claimant has had the following severe impairments: bilateral knee degenerative joint disease, lumbar muscle spasms, epicondylitis, hypertension, obstructions sleep apnea (OSA), obesity, and substance induced mood disorder versus schizoaffective disorder.

3.     Since the alleged onset date of disability, November 29, 2012, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.     After careful consideration of the entire record, the undersigned finds that since November 29, 2012, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant can lift and carry 10 pounds occasionally, 5 pounds frequently, stand and/or walk 4 hours, and sit for 4 hours in an 8-hour workday. She must use a cane when ambulating. She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can reach in front and occasionally reach overhead. She can frequently handle, finger and feel. She can have no exposure to loud machinery. She can perform simple, routine tasks with simple, short instructions. She can make simple decisions. She can tolerate few workplace changes, with no fast-paced production quotas. She can have occasional and superficial interaction with coworkers, supervisors, and the public.

5.     The claimant has no past relevant work.

6.     Prior to the established disability onset date, the claimant was a younger individual age 45-49. On May 9, 2017, the claimant's age category changed to an individual closely approaching advanced age.

7.     The claimant has at least a limited education, and is able to communicate in English.

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Prior to May 9, 2017, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

10.     Beginning on May 9, 2017, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that existed in significant numbers in the national economy that the claimant could perform.

11.     The claimant was not disabled prior to May 9, 2017, but became disabled on that date and has continued to be disabled through the date of this decision.

12.     The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability.

(Tr. 40-82) (citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not

25

subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

**A.      Whether the ALJ committed reversible error when she failed to recognize Ms. Norris' intellectual deficits and illiteracy as a severe impairment.**

Norris asserts that the ALJ committed reversible error by failing to recognize her intellectual deficits and illiteracy as severe impairments at step two of the evaluation process. (Doc. No. 12 at 17.) She alleges that the resulting decision, including the determination of residual functional capacity, does not adequately evaluate the evidence as a whole in regard to the severity of Ms. Norris' intellectual deficits and illiteracy. (*Id.*) The Commissioner disagrees, asserting that the ALJ's determinations were based on substantial evidence, and that Norris failed to establish that she had a severe impairment related to either an intellectual deficit or illiteracy. (Doc. No. 16 at 3.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a severe impairment. *See* 20 C.F.R. §§ 404.1520(a) (40)(ii). To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant''s physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). "An impairment . . . is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a). Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately

to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96 3p, 1996 WL 374181 at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96 8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may    when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When the ALJ considers all of a claimants impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e., an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe

impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

Social Security regulations define illiteracy as "the inability to read or write." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). The regulations explain:"We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." *Id.*

Norris points to six pieces of evidence which she asserts demonstrate the existence of her intellectual deficit and illiteracy:

- the May 2017 report of Dr. Litwin;

- the 2009 report of a consultative examiner for Social Security, which indicated she had been in special education classes from kindergarten through sixth grade;

- that she has never had a driver's license;

- that she walked out of her Vocational Guidance program when asked to do a non-preferred assignment;

- the food service situational assessment from the Vocational Guidance program noting that she "needed improvement" in following verbal and written instructions; and

- the February 2013 opinion of a second consultative examiner for Social Security that Norris would "have difficulty" with GED testing.

(Doc. No. 12 at 18-19.) The Commissioner argues that all of these pieces of evidence are addressed in the ALJ's opinion and do not demonstrate a severe impairment relating to an intellectual deficit and illiteracy. (Doc. No. 15 at 3-4.) Further, he asserts the ALJ did a through analysis of listing

12.04, which showed that Norris did not have a severe intellectual disability or illiteracy, and therefore and evaluation of listing 12.05 was not required.  (*Id.* at 4.)

Dr. Litwin is a psychologist who performed an evaluation of Norris on May 30, 2017, "to assist with vocational planning."  (Tr. 2213.)  He administered nationally-normed intelligence tests and assessed her verbal IQ at 61, performance IQ at 69, and full scale IQ at 66, which are all in the mild intellectual disability range.  (*Id.* at 2214.)   He also administered aptitude tests, and assessed her word reading at the second grade level, and spelling and math at the third grade level.  (*Id.*)  He noted that her aptitude levels were "below basic literacy," and she would not be able to complete job applications, read work forms for comprehension, or work on tasks involving strong numerical reasoning skills.  (*Id.* at 2216.)   The ALJ evaluated Dr. Litwin's report in her opinion, and gave "little weight" to his findings because Norris reported that she had been off her medications at the time.[5]   The ALJ also contrasted Dr. Litwin's findings with the relatively positive performance evaluations that Norris received on the content of her work during her training at Goodwill, where she met competitive standards for quantity 80% of the time and competitive standards for quality 56% of the time.  (*Id.* at 587.)

The 2009 report of a consultative examiner for Social Security, which indicated Norris had been in special education classes from kindergarten through sixth grade, is part of an earlier

---

[5]  At a March 29, 2018 pharmacologic management appointment, she informed the provider that "I have not been taking my medications since about April of 2017," and returned to treatment for the first time in over a year because "I used up my stash of Latuda" and needed more.  (Tr. 2623.)  The Sixth Circuit has held that it is appropriate for an ALJ to consider a claimant's "habit of selectively taking his prescribed medication" in assessing the claimant's credibility.  *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017), *cert. granted sub nom. Biestek v. Berryhill*, 138 S. Ct. 2677, 201 L. Ed. 2d 1070 (2018), and *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148, 203 L. Ed. 2d 504 (2019).

application that was not appealed, and is therefore final.[6]  (*Id.* at 73.)  The ALJ found that new and material evidence supported a finding of additional impairments, further limiting Norris' functional capacity.  (*Id.*)  No impairment based on intellectual disability or illiteracy was found in the 2009 decision, and the ALJ found that the consultative examiner's report was of "little evidentiary value" given that it was rendered three years prior to the alleged onset date in the application at issue here. (*Id.*)  Further, the record gives no indication of what type of special education services Norris received, and provides no basis to conclude that they were related to either an intellectual deficit or literacy.

The Commissioner asserts that Norris gives no explanation for why her lack of a driver's license, precipitous departure for the Vocational Guidance class, and Vocational Guidance assessment stating she needed some improvement at following verbal and written instructions are indicative of either intellectual defect or illiteracy.  (Doc. No. 16 at 3.)  Despite three hearings, Norris did not provide testimony stating that she had ever attempted to obtain a driver's license.[7]  Nor did the Vocational Guidance assessment identify illiteracy or intellectual defects as barriers to employment.  As the Commissioner points out, the "needs some improvement" designation checked by her assessors was the second highest possible level, below "adequate for a competitive setting" and above "needs much improvement" and "unacceptable."  (Tr. 1945.)   Further, those were the

---

[6]  In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond*, 126 F.3d 837, 842 (6th Cir. 1997) (relying on *Senters v. Sec'y of Health & Human Servs.*, No. 91-5966, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam).

[7] Norris did provide testimony that she had difficulty reading due to poor vision, and used a magnifying glass to read at home.  (Tr. 100.)

lowest marks received in the "learning aptitudes" section of her evaluation. (*Id.*) The other categories "learns new tasks" and "improves with repetition" were marked "adequate for competitive setting." (*Id.*) The narrative assessment began by stating "Sheray learns new tasks with ease" and concluded "I would not recommend competitive employment fo r Sheray at this time due to attendance and behavioral issues." (*Id.* at 1946.) This assessment does not, as a whole, indicate intellectual deficits.

In February 2013, consultative examiner Dr. David House provided an psychological evaluation of Norris. (*Id.* at 748-56.) He noted that "there was not information to advance a diagnosis relating to intellectual functioning," but he believe that "she would have difficulty with testing." (*Id.* at 753.) He opined that Norris had good long term memory, but her "short term memory is developed at a fairly low level," and could follow directions inconsistently unless they were "simple and short." (*Id.*) The ALJ gave Dr. House's opinion "partial weight." (*Id.*) She found that his opinion that Norris is restricted to following simple instructions was supported by his mental status examination, which showed poor short-term memory and poor computational skills. (*Id.*) However, she found his opinion regarding other areas of functioning inconsistent with the record as a whole, and noted that he did not have Norris' medical files available to review, and only met with her once. (*Id.*)

The Commissioner notes that the ALJ balanced the evidence cited by Norris against other evidence in the record, including mental status evaluations that showed normal attention and concentration. (Doc. No. 16 at 2.) The ALJ's finding of Norris' residual functional capacity included limitations which incorporate those aspects of Dr. House's findings which the ALJ found were consistent with the record as a whole: "She can perform simple, routine tasks with simple, short

32

instructions. She can make simple decisions." (Tr. 51.) The undersigned finds that the ALJ considered the cited here, the limitations in her determination of functional capacity are supported by substantial evidence, and that Norris failed to meet her burden of demonstrating an intellectual deficit or illiteracy rising that would meet or exceed listing. Accordingly, and for all the reasons set forth above, Norris' first assignment of error is without merit.

**B.** **Whether the ALJ properly evaluated and weighed the opinion of Ms. Norris' treating psychiatrist.**

Norris asserts that the ALJ erred by failing to evaluate and weigh the opinion of her treating psychiatrist at the Free Clinic, Dr. Park. (Doc. No. 12 at 20.) The ALJ gave "partial weight" to the medical source statement that Dr. Park completed in May 2013, on the basis that Dr. Park did not identify the diagnosis or symptoms that support his statements, or identify how long he had cared for Norris, and the ALJ's finding that while "Dr. Park's opinions may be consistent with his objective findings[8] . . . they are not consistent with the record as a whole." (Tr. 20.) Norris alleges that the ALJ did not identify any other medical evidence that rebuts Dr. Park's opinion, and she therefore failed to support her findings with substantial evidence. (Doc. No. 12 at 20.) The Commissioner argues that the ALJ appropriately weighed Dr. Park's opinion, and provided multiple good reasons and substantial evidence for her assessment. (Doc. No. 16 at 5-6.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the

---

[8] The ALJ's equivocation on this point makes sense, given that Dr. Park's treatment notes are handwritten and partially illegible.

opinion . . . dictates the process by which the Commissioner accords it weight." *Id.* "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.* In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart,* 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96 6p,[9] 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).[10] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p,[11] 1996 SSR LEXIS 9 at *9).

---

[9] SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

[10] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[11] SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[12] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at *5). *See also Gayheart*, 710 F.3d at 376.

However, in order to be considered a treating source, the physician must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition. 20 C.F.R. §§ 404.1502 and 416.902. *See*

---

[12] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

*Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015). Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 07 (6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 F. App'x 397, 398 (6th Cir. 2015); *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1000 01 n.3 (6th Cir. 2011.) *See also Fleischer,* 774 F. Supp. 2d at 879; *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008); *Carter v. Berryhill*, No. 1:16-cv-01840, 2017 WL 2544064 at *9 (N.D. Ohio May 26, 2017), *report and recommendation adopted by* No. 1:16 cv 01840*,* 2017 WL 2537066 (N.D. Ohio June 12, 2017); *Witnik v. Colvin,* No. 14 cv 00257, 2015 WL 691329 at *7 (N.D. Ohio Feb. 18, 2015); *Hickman v. Colvin*, No. 1:13 cv 00089, 2014 WL 2765670 at *12 (M.D. Tenn. June 18, 2014), *report and recommendation adopted by* No. 1:13 cv 00089*,* 2014 WL 3404967 (M.D. Tenn. July 10, 2014).

Norris argues that because Dr. Park was a treating physician,[13] and because his opinion is supported by his own treatment notes, it is entitled to complete deference. (Doc. No. 12 at 21-22.) This is a misstatement of the law. A treating source opinion must be given "controlling weight" if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic

---

[13] Although Dr. Park did not respond to the question regarding the treatment relationship on his medical source statement, treatment records provided by the Free Clinic document that he saw Norris beginning on November 14, 2012, and again on January 23, 2013 and February 20, 2013, and the Commissioner does not dispute Norris' assertion that he qualifies as a treating physician. (Tr. 736-37, 739-40, 742-45.)

techniques" and "is not inconsistent with the other substantial evidence *in [the] case record*." *Gayheart,* 710 F.3d at 376 (emphasis added).  The ALJ is not limited to reviewing the physician's own notes.  While Norris asserts that the ALJ did not identify any other specific medical records that contradict the elements of Dr. Park's opinion that she did not adopt, that, too, is a misstatement. (Doc. No. 12 at 20.)  In the paragraph where the ALJ explains her evaluation, she cites to five specific records which she believes are inconsistent with portions of Dr. Park's opinion.  (Tr. 75.)

The elements of Dr. Park's opinion that Norris believes the ALJ should have adopted include[14] that Norris could:

- rarely handle work stress or manage funds and schedules; and

- occasionally follow work rules, interact with supervisors, function independently without redirection, work with others, complete a normal work day and work week, behave in an emotionally stable manner, and relate predictably in social situations.

(Doc. No. 12 at 21.)  Instead, in her determination of residual functional capacity, the ALJ included the following mental-health based limitations: "She can perform simple, routine tasks with She can make simple decisions.  She can tolerate few workplace changes, with no fast-paced production quotas.  She can have occasional and superficial interaction with coworkers, supervisors, and the public."  (Tr. 51-52.)

---

[14]  The ALJ also found that Norris was more limited than Dr. Park opined in some areas. For example, he opined that Norris could "frequently understand, remember and carry out complex and detailed job instructions."  (Tr. 817.)  This is in conflict with the record evidence cited by Norris in support of her assertion that she has an intellectual deficit, *section VI.A., supra,* and the ALJ found the record as a whole supported limiting Norris to following "simple short instructions."  (*Id.* at 51.)  Norris does not challenge these deviations from Dr. Park's opinion, nor address how the contradiction between her arguments should be resolved if his opinion is given controlling weight.

The ALJ notes that multiple treatment records describe Norris' as having a "logical, organized" thought process, "sustained" attention and concentration, recent and remote memory "within normal limits" and "good" or "fair" judgment and insight.[15] (*Id.* at 75.) She also cites Norris' experience at the Goodwill Work Adjustment program which she attended in February 2016. (*Id.*) During that program, she was successful in some of the areas where Dr. Park opined she would only occasionally be functional: following work rules, interacting with supervisors, functioning independently without redirection, working with others, behaving in an emotionally stable manner, and relating predictably in social situations. (*Id.* at 587.) She did, however, struggle with attendance, quality of work and retention of tasks. (*Id.*) Norris also points out that Dr. Park's treatment notes show that she was "sober and experiencing hallucinations" in the period prior to his opinion. (Doc. No. 12 at 21.) However, medical treatment notes from April 2012 state that she has been sober for only 1.5 weeks, treatment notes from November 2012 state that she stopped using cocaine in September 2012, and at her first hearing in April 2015, Norris testified she had used cocaine and marijuana but stopped six months before the hearing. (*Id.* at 178, 1152.)

As the ALJ explained in her opinion, there is a substantial amount of evidence in the case record that is inconsistent with Dr. Park's May 2013 opinion, and therefore she did not commit reversible error by according it only partial weight. Accordingly, and for all the reasons set forth above, Norris' second assignment of error is without merit.

---

[15] The ALJ cites treatment notes from January 2011 (Tr. 642-42), November 2015 (*Id.* at 1982), and March 2018 (*Id.* at 2623), as examples.

**C.** **Whether the ALJ committed reversible error in her assessment of Ms. Norris' need for a cane when standing and its' impact on her residual functional capacity.**

Norris asserts that the ALJ committed reversible error in her assessment of Ms. Norris' need for a cane when standing, and therefore failed recognize that she needed to a cane while standing as well as walking. (Doc. No. 12 at 22.) The Commissioner responds that Norris failed to demonstrate that she needs a cane for standing, and points out that, in her brief, she does not cite any medical evidence that addresses Norris' need for a cane while standing, as opposed to walking. (Doc. No. 16 at 8.)

While Norris begins by citing medical records from 2012 and 2013, which show she experienced pain, weakness and swelling in her legs and feet, the records cited indicate that physical therapy she received at that time had the goal of relieving her back pain, and do not indicate that Norris had either a cane or a walker until she re-started physical therapy in May 2015. (Doc. No 12 at 23; 1277; 1826). Despite multiple sessions of physical therapy in 2013, no cane or walker was proscribed. (*Id.* at 1056-60;1077-79.) The Commissioner points out that the ALJ's opinion notes that Norris did not bring her cane to the Goodwill Work Adjustment program which she attended in February 2016. (Tr. 61.) The Court notes that medical records from throughout this period document that treatment providers did not believe her to be at risk for falls, even before she received the cane and walker.[16]

The ALJ based her determination that Norris needs a cane for walking but not standing on substantial evidence in the record. Such a determination is within her zone of discretion, and therefore, Norris' third assignment of error is without merit.

---

[16] *See, e.g.*, notes from April 2013 (Tr. 1038); May 2013 (*Id.* at 1049); February 2015 (*Id.* at 1770 ).

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**




                                           *s/Jonathan D. Greenberg*
                                           Jonathan D. Greenberg
                                           United States Magistrate Judge

Date: December 27, 2019